AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of South Carolina

In the Matter of the Search of  )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  2:19-cr-00567
)
Hoover Mitsubishi )
2250 Savannah Highway )
Charleston, SC 29414 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____ Judicial _____ District of _____ South Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1014 | False Statements |
| 18 U.S.C. § 1344 | Bank Fraud |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joseph Hamski, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/14/2019

_____
*Judge's signature*

City and state: Charleston, South Carolina

Mary Gordon Baker U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF HOOVER MITSUBISHI, LOCATED AT 2250 SAVANNAH HIGHWAY, CHARLESTON, SOUTH CAROLINA 29414 | Case No.   2:19-cr-00567 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Joseph Hamski, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant authorizing the seizure and examination of evidence at Hoover Mitsubishi, a car dealership business located at 2250 Savannah Highway, Charleston, South Caroilna 29414 (Premise to be Searched), to include any outbuildings and appurtenances, for evidence of violations of Title 18, United States Code (U.S.C.), Sections 1343 (Fraud by Wire), 1014 (False Statements), 1344 (Bank Fraud), 1956 (Money Laundering), and 371 (Conspiracy to defraud the United States). The premises to be searched is further described in Attachment A. The evidence to be seized is described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and as such I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510 (7) of Title 18, United States Code and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.



3.  I have been employed as a Special Agent of the FBI since April 2008. I have been assigned investigative responsibility in the areas of public corruption, civil rights, white collar crime, violent crime and computer crime in the Columbia Division, Charleston Resident Agency, of the FBI. Prior to my appointment as a Special Agent, I was employed as a Military Police Officer in the United States Army for approximately four years. I have received specialized training and/or on-the-job training in white collar crime matters. I have also received formal education and training in the concepts of probable cause and reasonableness for searches and seizures that conform with the application of the 4th amendment of the U.S. Constitution. I have received this training at the FBI Academy and other law enforcement learning centers.

4.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

5.  Hoover Mitsubishi of Charleston ("Hoover Mitsubishi") is a car dealership located at 2250 Savannah Highway, Charleston, South Carolina 29414, spealizing in the sale of new Mitsubishi vehicles and used cars in Charleston, South Carolina. According to their website[1], Hoover Mitsubishi is a family-owned and operated automotive dealership composed of "sales advisors, service technicians and financing experts." In addition to selling new and used

---

[1] https://www.hoovermitsubishi.com



vehicles and being staffed with an auto finance team, Hoover Mitsubishi services vehicles and sells auto parts.

6. According to the South Carolina Secretary of State business filings available online at web address https://businessfilings.sc.gov/BusinessFiling, Hoover Mitsubishi is a limited liability company registered to Mark R. Hoover, address 2250 Savannah Highway, Charleston, South Carolina 29414. Hoover Mitsubishi is one of four car dealerships owned and operated by Mark Hoover under the Hoover Automotive Group and/or Hoover Automotive, LLC. According to the website https://www.hooverthemover.com, the Hoover Automotive Group is a family owned and operated dealer group that has been in business since 1969 and offers a wide selection of Chrysler, Jeep, Dodge, Mitsubishi and Pre-owned vehicles. Business filings with the South Carolina Secretary of State also reveal Hoover Automotive, LLC is registered to Mark Hoover.

### I. Two Cooperating Witnesses provide statements implicating individuals at Hoover Mitsubishi.

#### A. Cooperating Witness #1

7. In April 2019, I interviewed a cooperating witness (CW1) who was formerly employed as the General Sales Manager (GSM) of Hoover Mitsubishi. CW1 informed that while he was an employed by Hoover Mitsubishi, other individuals who worked at the dealership and he engaged in illicit business practices beginning in or about November 2013 up until in or about August 2018. According to CW1, the other employees who actively conspired to commit the fraud included the following:

   a. Shawn Rustin – General Manager;

   b. Kentrell Davis – Finance Manager; and



3

    c. Mark Hoover – Owner of Hoover Mitsubishi.

 8. Together, the group conspired and executed a scheme to generate vehicle sales for the dealership by listing non-existent, or "phantom," trade-in vehicles and/or down payments in the sales paperwork provided to various lending institutions in an effort to obtain desirable financing arrangements for customers had no credit or poor credit (commonly referred to as "sub-prime customers"). Because of the risks associated with these customers, the lending institutions would be more likely to finance sales if they included trade-ins or cash down payments. Thus, CW1, Hoover, Rustin, and Davis fabricated these vehicle sales and loan paperwork in order to satisfy the lending institution and make the sale.

 9. CW1, Rustin, Davis and Hoover executed this scheme by creating two contracts for the same sale. One contract would list the phantom trade-in and/or down payment and would be submitted to the lending institution as part of the application for financing. By stating there was a trade in, the customer would obtain a more favorable interest rate on the vehicle loan. On average the customer's interest rate would be lowered by five percent allowing Hoover Mitsubishi to increase their profit. Hoover Mitsubishi would keep two to three percent of the interest rate savings while passing two to three percent savings back to the customer. CW1 advised the other contract omitted any mention of a trade-in and would be kept in the dealership's filing cabinets located in or near the accounting office.

 10. Rustin and/or Davis would typically draft the loan paperwork on the computers located within the sales department or on their office computers located within Hoover Mitsubishi. After the two contracts were prepared, Hoover knowingly signed both contracts. CW1 advised Hoover was the approving authority for all vehicle sales, and the sales paperwork required his signature. Records of vehicle sales and loan documents were retained in the



accounting office. Newer records were kept in the filing cabinets while older records were moved to the closet.

11. Also, in an effort to produce more sales and obtain financing for their customers, CW1 advised Rustin would manipulate customer pay stubs to inflate the customer's income to reflect more than it actually was. To do this, Rustin utilized the computers located in the sales office or the one in his office. CW1 stated Davis misled the various lending institutions by listing the manufacturer's rebate money as a customer's down payment. Davis utilized the computer located in the finance office to produce the false cash receipts that would be provided to the lending institution as proof of payment.

12. CW1 stated that he belived most, if not all, of the sub-prime customers would never have been provided a loan and advised that numerous lending institutions were negatively affected in these deals because some customers failed to consistently make payments and defaulted on their loans. CW1 provided the following non-exhaustive list of lending institutions he believed were victimized by this scheme:

    a. Americredit,

    b. Santander Bank,

    c. Global Lending Services,

    d. Exiter Finance Corporation,

    e. PNC Bank,

    f. Ally Bank,

    g. Skopos Financial, and

    h. Veritas Credit Union.



13.     CW1 believed that many customers would never have been provided a loan had it not been for the doctored paperwork.

14.     CW1 also admitted Veritas Credit Union was particularly taken advantage of because Veritas Credit Union blindly matched any financing offer submitted by the Hoover Mitsubishi. CW1 witnessed Rustin produce and submit fake approval documentation of a competitor to Veritas Credit Union, thereby compelling them to match the offer.

### B. Cooperating Witness #2

15.     In addition to CW1, your affiant also interviewed a second cooperating witness (CW2), who served as a salesman with Hoover Mitsubishi from 2012 to 2018. CW2 confirmed that Hoover Mitsubishi was engaged in illicit business practices during the timeframe noted above. CW2 explained that Rustin, Davis, CW1, and Hoover devised and executed several fraudulent schemes to sell more vehicles and that they all benefitted financially from their acts. CW2 indicated the most predominant scheme was to list a phantom down payment or phantom trade-in vehicle on a customer's finance paperwork in order to increase chances of qualifying for a loan by the lending institution. CW2 advised that indicating there was collateral would reduce or eliminate a stipulation a lending institution may require for the customer's loan to be approved.

16.     To execute this scheme, CW2 stated that the sales manager would receive a hand written credit application, filled out by the customer. The salesman would take the credit application along with a vehicle purchase contract to the sales manager. Utilizing the credit application and contract data, the sales manager would then search for lending institutions willing to do provide a loan to the customer. CW2 stated that, at this stage in the scheme, CW1 would then destroy the hand written credit application, fill out and submit a digital credit

6



application containing the doctored documentation, and then shop the application to potential lending institutions. If a lending institution agreed to provide the loan, the finance manager would generate two different customer contracts for the same sale. The contract reflecting the phantom trade-in or down payment would then be submitted to the lending institution while the legitimate contract would be retained within the Hoover Mitsubishi dealership.

17.     CW2 stated the sales contracts retained at Hoover Mitsubishi for the new vehicles will likely show a manufacturer's rebate while there will be no indication that a down payment or vehicle trade-in was a part of the sale. CW2 further explained that in some instances when a customer wished to buy a new vehicle, Rustin and Davis would falsely list the manufacturer's rebate money as the customer's down payment. CW2 stated Davis, utilizing the computer within the finance office, would fabricate a receipt stating the customer made a cash down payment and include it in the sales contract paperwork. That sales contract would then be sent to a lending institution to be processed.

18.     CW2 stated approximately 10-15 times he personally paid another Hoover Mitsubishi employee to fabricate false proof of residency forms for potential customers. CW2 admitted he paid that employee $20.00 for a fabricated South Carolina Electric and Gas (SCE&G) bill to show a customer lived at the same residence as the co-signer. CW2 advised a customer had a better chance to obtain a loan from a lending institution if they shared a residence with the co-signer. CW2 and the said Hoover Mitsubishi employee he paid would regularly utilize a desktop computer located at the sales desk within Hoover Mitsubishi to fabricate the SCE&G bills. CW2 advised Rustin had firsthand knowledge of this scheme and would also fabricate SCE&G bills in his private office located at Hoover Mitsubishi.



19. CW2 also advised Hoover Mitsubishi participated in a "stair step incentive program" which meant that the dealership would receive rebates from Mitsubishi Motors Corporation, the manufacturer, if a certain number of new Mitsubishi vehicles were sold each month. CW2 explained that while executing the above mentioned scheme, Hoover Mitsubishi was meeting the manufacturer's incentives and set goals, thereby earning the manufacturer rebates. The rebates were money provided to the dealership, which in turn was divided and disseminated to its employees for achieving the quota. This money served as a financial goal to attain collectively. CW2 admitted that more sales were achieved when the parties involved fabricated the vehicle sales and loan contracts. By doing so, it helped the dealership meet the manufacturer's incentives, which resulted in Hoover Mitsubishi employees benefitting monetarily.

20. CW2 also stated he shared CW1's belief that Veritas Credit Union was particularly taken advantage of because Veritas Credit Union blindly matched any financing offer submitted by the Hoover Mitsubishi. CW2 also witnessed Rustin produce and submit fake approval documentation of a competitor to Veritas Credit Union, thereby compelling them to match the offer. CW2 observed Rustin produce the fake documents on the computer in the general manager's office.

21. CW2 estimated Hoover Mitsubishi generally sold 50 to 60 vehicles per a month, approximately 30 of which involved the aforementioned fraud schemes. Between 2014 to 2018, CW2 stated that both he and almost every employee of Hoover Mitsubishi benefited financially from the schemes.



**II.     Investigation leads to the identification of specific instances of suspected fraud.**

22.     Through the investigation, your affiant identified several instances indicative of the fraudulent schemes described by the cooperating witnesses.

23.     On or about September 22, 2015, Regional Acceptance Corporation, a subsidiary of BB&T Bank, declined a $20,258.50 auto loan application in which a borrower had applied for financing of a 2015 Mitsubishi Outlander Sport to be purchased from Hoover Mitsubishi. After reviewing the loan application and supporting documents to include a suspicious pay stub, Regional Acceptance Corporation contacted the borrower to verify income. The borrower advised he had not provided a pay stub to Hoover Mitsubishi. After contacting Shawn Rustin about the issue, Regional Acceptance Corportation ultimately concluded the pay stub was fabricated by Hoover Mitsubishi personnel because the style of the pay stub was similar to that of other borrower's pay stubs submitted previously.

24.     On or about September 5, 2016, PNC Bank provided an auto loan to a borrower in the amount of $53,236 for the purchase of a vehicle from the Hoover Automotive Group. Approximately six months after the loan was granted, the borrower informed PNC Bank that the income reported on his car loan application was deliberately inflated by the Hoover Automotive Group. In addition to more than doubling his income, the loan application also reported the borrower owned his residence, which was not true.

25.     On or about May 27, 2015, an auto loan application was submitted with Capital One Auto Finance by a customer attempting to purchase and finance a vehicle from Hoover Mitsubishi. The application and contract filed by representatives of Hoover Mitsubishi reflected the applicant to reside at the same address as the co-applicant. However, when the bank contacted and interviewed the applicants for a pre-funding interview, it was learned applicants



did not reside together. The bank concluded the information was intentionally distorted in order to qualify for the loan. In this matter, no loan was provided due to the misrepresentation on the loan documents and potential fraud.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26.  Based on my knowledge, training, and experience, I know that a computer's hard drive can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27.  There is probable cause to believe that things that were once stored on the hard drive may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In



10

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

1. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

2. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

c. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Media because:

1. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted



11

from a word processing file). With respect to the hard drive, virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices (thumb drives) or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

2. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

3. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

4. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can



be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

5. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

d. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Media consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

e. *Duration of examination.* Your affiant will ensure that the search techniques described herein are executed in a timely fashion in order to avoid unnecessarily hindering Hoover Mitsubishi's ability to conduct business.



## CONCLUSION

28.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the laptop described in Attachment A to seek the items described in Attachment B.

29.     AUSA Matt Austin has reviewed this affidavit.

Respectfully submitted,

JOSEPH HAMSKI
Special Agent
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me
on June 14, 2019.

HON. MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE